Good morning, Your Honors. May it please the Court, my name is Nica Rapkin. I'm appearing on behalf of Mr. Izquierdo-Rios and his family. Before I get started, I'd just like to mention that I am hard of hearing, so please bear with me if I have to ask you to repeat yourselves, and to the extent you can speak directly into your microphones, I'd very much appreciate it. Also, I'd like to reserve two minutes for rebuttal, please. All right? Thank you. Could you speak a bit louder and into the microphone? Sure. Mr. Izquierdo-Rios and his family came to the United States from Peru after Mr. Izquierdo was persecuted by the Shining Path because he was acting as an informant against them. There's only one issue before the Court today, and that's the question of whether this persecution of Mr. Izquierdo was, in fact, attributable to political beliefs that the Shining Path imputed to him. As such, this case is governed by this Court's en banc determination in Briones, which says essentially that an individual who chooses to side with the government as an informant in a dispute that is political at its core would be perceived as a political act by the organization being informed upon. Let me ask you, does it matter whether he was employed by the police or whether he was simply working at the warehouse and decided to help out the police? Your Honor, I would submit that it does not matter. I believe there's very strong evidence in the record that suggests that he was not, in fact, a police officer, but was merely a university employee. But in any event that shouldn't inform the analysis, this Court in Lim employed the Briones standard to find that an individual acting as a police officer who infiltrated a political organization was entitled to asylum for his work as a police officer. So whether or not Petitioner was a police officer really is irrelevant to the analysis here. Well, we have cases that say it's not irrelevant at all, don't we? I'm sorry? Excuse me? We have cases that say it is not irrelevant, do we not? It's that, well, if a person's working for the police, and they know they decided they know that, and they're a taskmaster because he's a police officer, basically, and even though he's an informing police officer, that's not good enough. We have said that in cases, correct? Yes. There's the rule that was demonstrated in Cruz-Navarro that indicates that persecution of an individual because of his status as a police officer or as a member of the military by itself is insufficient to justify a finding of asylum on the basis of either a membership in a protected group or on the basis of imputed political beliefs. Correct. But that's not what's going on in this current case. Here's what's going on. That this guy, this guy, let's say, Arguendo, they say is a police agent. He's working for the police, obviously. He doesn't get a job as an employee of a university, and then decide, gee, I think I'll inform on these guys. He gets a job with the police. They place him in a university in a special position, higher than he could ever get by himself, and at twice the normal rate, et cetera, et cetera. Clearly, they could say, maybe he's not. He's just a police agent. He's a policeman. That's what he's doing, and that's he's doing his job. And they find out he's a policeman doing his job, and they attack him. Assuming Arguendo. Why is that much different from Cruz? I would submit that this case is actually far more analogous to the Lim case than the Cruz case. And the distinction between those two cases is essentially that Lim, like the Petitioner here, was specifically targeting a specific organization. His role was entirely devoted to thwarting the political activities of this anti-government group. Whereas in Cruz Navarro, the Petitioner had been stationed in a number of cities, and it happened at the time that he was stationed in one with a particular guerrilla presence, that it was a notorious death trap for police officers because they were taking against that organization. You know, we're not – this case is not covered by the Real ID Act. But should we be at all concerned the fact that the Real ID Act was partly intended to reverse Freones and such? That – I'm sorry, what was intended to reverse? Should we at all consider the fact that when Congress passed the Real ID Act, one of its purposes was to undo what it considered the terrible decision in Freones and such? Should we think about that? It doesn't cover this case, literally. I have to say I'm not as familiar with the Act as I can. That's sort of a curve, probably. It's all right. But it doesn't govern here, so luckily you don't have to be familiar with it. But, you know, one of the questions comes out of your argument, though, and it would mean that, you know, we have literally hundreds of police forces across the world that are battling who they see as political enemies of the State. And would that mean that per force they would, in effect, be kind of baseline eligible for asylum? You know, whether it's the New People's Army used to be in the Philippines or whether it's going on in Iraq, or you pick a country, you know, Pakistan. Would all those police forces, in effect, be eligible for asylum because they are fighting against political enemies who are not too happy about the people informing or investigating their activities? I have two responses to that, Your Honor. The first is that there's real distinction in the cases where the individuals are afraid that they will be persecuted because of their activities as members of the police force or as members of the military. But such persecution hasn't yet occurred, so any inference, they're essentially assuming the possibility of such an inference, which is entirely distinguishable from this case where the persecution has actually occurred. But I would submit even more importantly, for the purposes of this case, not only was the Petitioner serving, assuming he was serving as a police agent against this organization, he was specifically targeting their political activities. This is a particularly compelling case in this instance because he, there's a special reason for them to be imputing political beliefs to him. The activities he was specifically spying on were political marches, political demonstrations, political graffiti on the walls, bad things that these individuals would say about the government. And those were the, and also their efforts to draw students to their cause within the university walls. So there's something inherently political in this case that would even distinguish it further from a case of somebody acting as a police agent or as an agent of the military. Thank you. Did you want to save time for a rebuttal? Yes, please, Your Honor. May it please the Court. My name is Melanie Proctor, Assistant United States Attorney, and I represent the Respondent Appellee, Peter D. Keisler, United States Attorney General. We are here this morning because a self-described undercover agent for the Peruvian police is now claiming that the three men who attacked him did so on account of an imputed political opinion. Under the law of the United States Supreme Court and this circuit, his claims fail. Under Elias Zacharias, reversal is appropriate only if the record compels a finding that persecution was on account of a protected ground. In Cruz Navarro, which is directly on point, the circuit determined that where a Peruvian police officer was attacked and in the course of that attack referred to as an informant that was not akin to imputing a political belief to him. The facts of this case do not compel a different result. And I would submit there's another issue in this case as well.  Under the United States Code and Cardozo-Fonseca, the discretionary determination is not to be disturbed unless it's manifestly contrary to law and was not an abuse of discretion. Mr. Rios clearly was acting on behalf of the police. He was employed by the police at the university. There are facts throughout the record that support this. At page 70, he testified that he got the job through the police. Page 72, his job was to inform on a shining path. Pages 95 to 96, he discussed how the salary was set by the police. The major asked him how much he wished to be paid. He set a price, and he was paid that. Page 97, he testified that he had access to restricted police files. In his declaration at page 261, he discussed the fact that he had a special police-issued ID. Pages 262 and 97, again, he discussed the police files. He described himself in his declaration as a member of the Delta IV team. And he stated that the his colleagues at the university became suspicious of him because he did not have to take the entry exam for his job, he had a salary that was two times higher of that of other people who were being paid, and he was a contract worker in a supervisory position, which was not reasonable. Kagan, counsel for Mr. Izquierdo says that it really doesn't matter whether he's a police officer infiltrating as an informant or a citizen informing on behalf of the IJ, that the finding, in her view, wouldn't make any difference, and then she cites to the Lim case. Would you address that, please? Yes, Your Honor. The Lim case was factually distinctive from here. In that case, he was a police officer who operated with the intelligence unit and revealed his identity as a police officer through investigations. In that case, the persecution, if there is any persecution in this case, which was not directly addressed by the IJ, but the persecution in Lim included his name on an NPA death list, indicating that the organization as a whole was interested in assassinating him, and he received threats, phone calls, and letters with a black ribbon, which was well known in the Philippines to be an indication that he was going to be targeted and killed. And in that case, the threats continued even after he left the police force. In this case, there were threats that appeared at his desk, at Mr. Rios' desk at the university. And although he did state strange people walked by his house, there were no – there was no targeting of the house where he lived. And furthermore, after he's left Peru, there's been no future threats and no threats of harm to the family which he resided with. So Lim is very, very much factually distinguishable, as is Briones and Mejia, the other three cases relied on by Petitioner. There's simply no evidence in the record that Mr. Rios was attacked on account of any kind of political opinion, imputed or otherwise. He clearly did not have a political opinion motivating his job with the police. And the only fact that he can rely on to indicate that there was some kind of imputation is that he was called a police informant and a snitch. The Petitioner and Cruz Navarro received the same threats when he was attacked, and that was not sufficient. Turning to the issue of the immigration judge's discretionary decision, the immigration judge made a clear determination that there was little likelihood of future persecution based on the facts in the – in the record. The only fact he cited was the fact that Shining Path has lost some of its power, right? Respectfully, Your Honor, I disagree with that statement.  He did not go back through a recitation of the facts. However, his well-reasoned and carefully worded decision cites the facts I just mentioned, that there were no future threats. The threats did not continue once Lim left – excuse me, Mr. Rios left Peru. He was living with his wife's family, and there were no threats against his wife's family, unlike the Petitioners and the other cases relied on by Mr. Rios. If the Court has no further questions, I'll submit on the briefs. All right. Thank you. You have some rebuttal time. Thank you, Your Honors. First, I'd like to respond to the issue about the finding of discretion. In this case, the IJ's finding of discretionary finding must be reversed. That's pursuant to the Mammouzian case, which is cited in the briefs. Essentially, where the IJ's opinion findings, discretionary finders, are so intertwined with the IJ's eligibility findings, the decision, the discretionary determination must be reversed as a matter of law and redone. In this instance, the intertwining is clear because the IJ found that there is no fear of future persecution because Petitioner could relocate within the country of Peru or because the police could easily arrest the individuals who persecuted Petitioner. However, the grounds for that finding are informed by the fact that the IJ determined this was not a political case. Because this is a political case, we're not talking about a few individuals who were targeting the Petitioner. We're talking about an organization that's national widespread, notorious terrorist, the Shining Path, and it's the entire organization that is going to be making efforts to retaliate against Petitioner for his work to thwart their cause. I'd also like to respond to the Lim case and the discussion of the Lim case. It really shouldn't matter for the purposes of this analysis whether the persecution occurred while the individual was a police officer or afterwards. The issue is whether the individuals attacking the Petitioner were doing so because they were imputing political beliefs to him. They're imputing political beliefs to him because of his activities against him as a police officer. When the persecution occurred, it's fundamentally irrelevant to the motives of the persecutors. As a final matter, I'd also like to he was not we would submit that he was not a police officer. I'm sorry. I see that I'm out of time. No, you may finish your comments, please. The basis for suggesting that he was not a police officer are the individuals he identified were not arrested, but discharged from the university. He retained his university position after he had completed his tasks identifying the infiltrators. And he was received his salary from the university. He never received police training, did not carry a gun or any police identification. That's all, Your Honor. Thank you. Thank you. Thank both counsel for your arguments. The case of Izquierdo Rios v. Gonzales, or Keisler, is submitted. This case also was part of our pro bono program, and so I particularly thank counsel for Mr. Izquierdo Rios. It helps the court, and I also think helps opposing counsel when we have good briefing and argument in these cases. So we thank you for participating in the court's pro bono program. Thank you.
judges: Noonan, Fernandez, McKeown